**\*NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
SABER SOLUTIONS, INC.,                  :
                                        :         Civil Action No.06-4922 (FLW)
            Plaintiff,                   :
                                        :              **OPINION**
      v.                                 :
                                        :
PROTECH SOLUTIONS, INC.,                 :
                                        :
      Defendant/Counterclaim-Plaintiff  :
                                        :
      v.                                 :
                                        :
COVANSYS CORP.,                          :
                                        :
      Third-Party Defendant.             :
_____ :

**WOLFSON, United States District Judge**:

        The instant action arises out of the contractual relationship between Plaintiff Saber
Solutions, Inc. ("Saber" or "Plaintiff"), Third-Party Defendant Covansys Corporation
("Covansys")(collectively, "Saber Defendants"), and Defendant/Third-Party Plaintiff Protech
Solutions, Inc. ("Protech")**.**  Protech entered into a Teaming Agreement with Covansys with the
expectation that Covansys would submit a bid to the New Jersey Department of Human Services
for the development of a child welfare support computer system.  Less than two weeks before
bids were due for the project, Covansys determined that it would not pursue the project and
terminated the Teaming Agreement.  However, with the assistance of Covansys, Protech
submitted its own bid as the prime contractor for the project, listing Covansys as one of its
subcontractors.  After the project was awarded to Protech, Protech proceeded without the
involvement of Covansys.  Saber, an assignee of Covansys, brought the instant action alleging

that Protech: (1) breached the Teaming Agreement by failing to allocate work to Covansys and (2) breached its duty of good faith and fair dealing by refusing to comply with its obligations under the Teaming Agreement.  In the alternative, Saber asserts that it is entitled to relief under the theories of unjust enrichment and quantum meruit.  In the instant matter, Protech moves for partial summary judgment on all Counts of the Complaint; and Saber Defendants move for partial summary judgment to dismiss Protech's counterclaims and Third-Party Complaint. For the reasons that follow, Protech's motion is GRANTED in part and DENIED in part, and Saber Defendants' motion for summary judgment is GRANTED.

## BACKGROUND & PROCEDURAL HISTORY

In 2005, the New Jersey Department of Human Services sought bids through a Request For Proposal ("RFP") to develop an automated child support enforcement system ("the Project") that was expected to last five to six years.  Declaration of Shiva Duvvuru ("Duvvuru Decl.") at ¶ 3. Covansys, a software systems developer, responded to the RFP, and in order to accommodate the size and complexity of the project, approached other companies to assist in the Project as subcontractors.  Id. at ¶ 5.  Protech had previous experiences with child support systems for other states and agreed to be a subcontractor for Covansys in its bid for the Project. Id. at ¶ 6. Covansys subsequently entered into an initial Teaming Agreement with Protech on March 12, 2005 ("April Agreement").  Id. at ¶ 7. The April Agreement stated that Protech would act as a subcontractor for Covansys if Covansys won the Project from New Jersey. Id.  Around the same time that Protech signed this Agreement with Covansys, three other companies, IBM, RCM Technologies, Inc., and Courtland Consulting signed similar Teaming Agreements. Id. at ¶ 8. As

a part of the terms, Protech alleges that it had full access to the proposal while it was being prepared by Covansys, and Protech would also have access to the final version.  Id. at ¶ 11.

Before the bids came due, Covansys decided that it would not submit a bid for the Project, and notified Protech of its decision in a letter dated June 3, 2005. Id. at ¶ 10. According to Covansys, it worked on the bid proposal for over eight weeks, which included more than 300 pages detailing the scope of the work to be performed; the estimated value of its work was $447,806. Declaration of Hal Carl ("Carl Decl.") ¶ 4; Ex. A. Covansys withdrew from the Project for a variety of business issues, including the overwhelming risks associated with this large, fixed price project. Statement of Undisputed Material Facts ("St. of Facts") at ¶ 2. Already having devoted a significant amount of time and effort preparing for the project, Protech decided it would attempt to bid for the Project as the prime vendor. Duvvuru Decl. at ¶ 11. Protech asked Covansys to provide it with a copy of the draft proposal pursuant to the April Agreement.  Id.  It also offered Covansys the opportunity to become a subcontractor if Protech received the bid.  Id.  Covansys complied and provided Protech with a draft of the Proposal, and it also agreed to serve as a subcontractor if Protech were awarded the Project.[1]  Id. at ¶ 12. According to Covansys, it agreed to cooperate with Protech in submitting a bid with the expectation that Protech would hire Covansys as a subcontractor if Protech won the bid.  Carl

---

[1]

Covansys alleges that "Protech asked if it could use the bid Covansys prepared and pursue the opportunity [as] a prime contractor. Covansys agreed to Protech's request and even agreed to cooperate with Protech in support of Protech's effort to win the State contract. Covansys did, however, expect fair compensation for its agreement to let Protech use the bid that Covansys had prepared." St. of Facts at ¶ 3.

3

Decl. at ¶ 4.

On June 15, 2005, Protech submitted a bid to the State of New Jersey for the Project. Duvvuru Decl. at ¶ 4. The Proposal identified Covansys as a subcontractor, and specifically identified four Covansys employees who would serve on the project, Arasu Dakshin, Anasu Rangaro, Rob Phillips, and Neeraj Pandey. Id. Protech's bid identified Arasu Dakshin, an employee of Covansys, as Deputy Project Manager, a key position on the project. Id. On September 15, 2005, the parties finalized their agreement ("September Agreement") for Covansys to work as a subcontractor on the Project. Id. at ¶ 16. The September Agreement specified that each party would bear its own expenses in connection with the proposal's preparation, and that neither party could assign or transfer any of its "rights, privileges or obligations" without the prior written consent of the other. Id. at ¶ 20; See September Teaming Agreement at p. 2. The Agreement provided that "at a minimum, Covansys would provide the 'key personnel' named in the bid that Protech submitted to New Jersey.[2] See id. The September Agreement further provided that Covansys was to perform 20 percent, or about 60,000 hours, of

---

[2]

The term key personnel and who were identified as key personnel are disputed. Plaintiff argues that only one Covansys employee was named as "Key Personnel" in the proposal, Mr. Dakshin, and that he could not be produced due to his wife suffering from a serious health problem. Pl.'s Br. for Opp. at 2, n. 1. Saber claims that "[t]he other three Covansys employees named in the proposal, Anasu Rangara, Rob Phillips, and Neeraj Pandey, were not named as 'Key Personnel,' and therefore were not required to be produced." Id. at 2-3. Although Covansys and Saber were willing to provide one, if not all of the three mentioned, "their ability to do so depended on their ability to assign other resources to the Project at lower billing rates in order to achieve the contractually mandated blended rate of $64/hour." Id. at 3.; see Supplemental Declaration of Hal Carl at ¶ 7. Defendant alleges that "key personnel" included all four individuals, Arasu Dakshin, Anasu Rangaro, Rob Phillips, and Neeraj Pandey. Duvvuru Decl. at ¶ 21.

necessary work on the project at a "blended rate" of $64.00 per hour. See id. Dakshin, as the Deputy Project Manager, was to be paid $147.00 per hour.[3] Id. Finally, the September Agreement expressly stated that "[t]he validity, performance, and construction of this Agreement shall be governed by the laws of the State of Arkansas." Id.

On November 16, 2005, the State of New Jersey requested Protech to provide a "best and final offer" ("BFO") concerning the price contained in the June 15, 2005 proposal. Duvvuru Decl. at ¶ 23. On November 20, 2005, Protech submitted its BFO and lowered its original price of $73 million to $58 million, a 20% decrease.[4] Id. at ¶ 24. After receiving the BFO, New Jersey awarded the Project to Protech. Id. at ¶ 26. Soon thereafter, while Covansys and Protech were involved in negotiations about Covansys's specific involvement in the Project, Covansys advised Protech that it had agreed to sell its entire state and local government practice to Saber. Id. at ¶ 28. It stated that the entirety of its employees, including those identified in the proposal, would become Saber employees. Id. at ¶ 30. Protech was also allegedly informed that Dakshin

---

[3]

Protech alleges that "[t]he position of Deputy Manager was a critical position for the success of the NJDHS project," and that it "relied upon Covansys's representation that it was committing Mr. Dakshin to the project both in submitting its bid to NJDHS and in entering into the September Teaming Agreement." Duvvuru Decl. at ¶ 22.

[4]

Prior to submitting its BFO, Protech contacted its four subcontractors about reducing their prices to allow Protech to reduce its bid price. Three of the subcontractors, IBM, RCM, and Courtland agreed to lower its prices, however, Covansys refused to reduce its prices but in an effort to help Protech win the bid, it "agree[d] to reduce its participation in the project from 20% of the projected hours to 15%, or from approximately 60,000 hours to 45,000 hours." Duvvuru Decl. at ¶ 25; Carl Decl. at ¶ 5.

would be unable to serve as Deputy Project Manager.[5]  Id.  Subsequently, Protech sought, and received, permission from the State to replace Dakshin.  Id. at ¶ 32.

After Protech was informed of the sale of Covansys to Saber and of Dakshin's release from the project, Protech, Covansys, and later Saber, attempted to negotiate replacements for Dakshin. Carl Decl. at ¶ 9.  Covansys alleges that Protech did not negotiate in good faith because "Protech unreasonably proposed that higher-level employees should work at cut rates." Id.  On May 8, 2006, Covansys' Vice President, Arvind Malhotra, sent Director of Protech, Nagaraj Garimalla, a letter "expressing concern about Protech's failure to fulfill its obligations under the Teaming Agreement, and among other things noting Protech's failure to offer reasonable explanations for the rejection of Covansys' candidates." Id. at ¶ 10. By letter dated May 8, 2006, Protech responded, and Covansys alleges that it:

> [(1)] offered no objection or even comment about Covansys' sale of its public sector business to Saber, even though the sale had been announced two months earlier, on March 8, 2006. . . . [(2) Protech] expressly acknowledged Covansys' contribution to Protech's successful bid. . . . [and (3)] although [Protech] complained about Arasu Dakshin's unavailability to work on the Project, [it] proposed a compromise whereby Covansys/Saber's share of the Project would be reduced (on a gross revenue basis) by $1,500,000.00, to a total of $1,900,000.00, . . . thus acknowledging that [Protech] did not consider Mr. Dakshin's unavailability to relieve Protech of all responsibility under the Teaming Agreement.

Id.; see Ex. F to Carl Decl. ("Ex. F"). Protech claims that "the candidates proposed by Covansys either did not have the right technical qualifications or, if they did, were offered at rates that would not have enabled Protech to staff the project efficiently and achieve the blended rate of

---

[5]

Dakshin was unable to work on the Project due to his wife's medical condition in Ohio and Plaintiff argues that it never refused to make Dakshin available. Pl.'s Br. for Opp. at 2, n. 1.

$64 per hour specified in the September Teaming Agreement." Duvvuru Decl. at ¶ 33.

After June 1, 2006, Saber assumed control of Covansys and continued attempts to secure the subcontract with Protech.  Carl Decl. at ¶ 11.  In August, Saber sent representatives to New Jersey to meet with Protech representatives for two days to negotiate a "proposal whereby Protech would at least begin to fulfill its obligation under the Teaming Agreement by providing subcontract work to Saber." Id.  However, the negotiations were unsuccessful.  Id.  Protech alleges that it was able to find qualified candidates with appropriate billing rates and obtained permission from New Jersey to use those employees instead of the individuals that were supposed to be supplied by Covansys. Duvvuru Decl. at ¶ 34.

On October 13, 2006, Saber filed its Complaint against Protech.  Sabers alleges that (1) Protech breached the September Agreement by not subcontracting work to Covansys and seeks to recover the profits that it claims it would have received if it had successfully performed under the agreement; (2) Saber is entitled under quantum meruit to recover the reasonable value of the proposal (no less than $500,000) that its predecessor, Covansys, allowed Protech to use because Protech failed to give Covansys anything of value in return; (3) Protech has been unjustly enriched by the amount of profits that Protech receives from the Project, that is no less than $18,000,000 as a result of using the proposal that Covansys allowed it to use; and (4) Protech breached its duty of good faith and fair dealing by failing to comply with its obligations under its agreement with Covansys. Compl. at ¶¶ 20-34. On the first three counts, breach of contract, quantum meruit, and unjust enrichment, Saber seeks compensatory and consequential damages, and on the fourth count, breach of the covenant of good faith and fair dealing, it seeks

compensatory, consequential, and punitive damages. Id. at 7-8. In addition, Saber seeks an award for attorneys' fees, and costs and disbursements incurred as a result of this matter. Id. at 8.

The parties participated in a series of settlement conferences with the Honorable John Hughes, U.S.M.J. (ret.) ("Judge Hughes"), before fact discovery was completed. After unsuccessful mediation attempts, on February 1, 2008, Judge Hughes ordered Protech to file a motion for partial summary judgment based upon two liability issues Id.; see Order dated February 8, 2008. Protech complied and, on February 22, 2008, filed a motion for partial summary judgment "requesting that the Court dismiss Saber's claims against it based upon Covansys's undisputed refusal to make Arasu Dakshin available as the Deputy Project Manager on the Project and based upon Covansys's effort to assign rights under the Teaming Agreement to Saber without the written or other permission of Protech, in direct contravention of Paragraph 10 of the Teaming Agreement." On September 22, 2008, this Court denied Protech's motion for summary judgment without prejudice, "noting that the parties had not provided an adequate choice of law analysis." Id.; see Order dated September 22, 2008.

On December 24, 2008, Saber filed this Motion for Partial Summary Judgment to dismiss all of the claims in Defendant's Counterclaim/Third-Party Complaint. In response, Protech opposes Saber's motion and moves for partial summary judgment to dismiss all Counts of the Complaint.

## DISCUSSION

## I.    STANDARD OF REVIEW

"Summary judgment is proper if there is no genuine issue of material fact and if,

viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56©. For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Curley v. Klem, 298 F.3d 271, 276-77 (3d Cir. 2002). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Kaucher, 455 F.3d at 423. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992)

(quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56© mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

Moreover, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## II.    Protech's Counterclaims

As a preliminary matter, the Court notes that Protech, in its current motion, advances different legal theories than in the parties' previous motion for partial summary judgment.  In the previous motion, as a defense to Saber's claim that Protech breached the September Agreement, Protech argued that Covansys committed an anticipatory breach of the Agreement, which would relieve Protech from any obligation to perform.  More specifically, Protech maintained that Covansys breached the material terms of the Agreement in two respects: first, Covansys expressly stated that it would not act as a subcontractor on the Project but would instead attempt to assign its rights under the September Agreement to Saber; and second, Covansys failed to

make available certain key personnel, particularly Mr. Dakshin, for the Project.  While Saber Defendants address briefly the assignment contention in the present motions, Protech does little to advance its position.  Rather, in its motion papers, Protech opposes Saber Defendants' motion and asks the Court to dismiss Saber's claims because the damages that Saber seeks in the Complaint are unavailable as a matter of Arkansas contract law.  Nevertheless, without setting forth its argument in detail, Protech mentions that it does not agree with Saber's view with respect to Covansys' assignment of rights to Saber.  As the Court has already dismissed Protech's previous motion for summary judgment, it will address and decide the arguments presented by the parties in their current motions.[6]

In its counterclaims, Protech asserts a breach of contract claim and claim for breach of the duty of good faith and fair dealing.  Protech's request for damages primarily consists of the time Protech's employees spent negotiating and interviewing candidates to replace Covansys on the Project.[7]  Saber Defendants argue that Protech's counterclaims should be dismissed because 1) Protech's alleged damages, for time spent negotiating and interviewing subcontractors for the Project, is not compensable under the express terms of their agreement, and, in any event, not compensable as a matter of Arkansas contract law; and 2) Protech actually profited from its

---

[6]Neither party disputes that Arkansas law controls in this case.  In fact, the September Agreement has an Arkansas choice of law provision.  Accordingly, the Court will apply Arkansas law.

[7]In its Counterclaims, Protech does not specifically define what type of damages it seeks.  Rather, the only damages Protech referenced in its breach of contract claim are the mitigation damages it incurred as a result of Covansys' alleged breach.  As such, the Court will only focus on this type of damages in Saber Defendants' motion.

decision to not hire Covansys and, therefore, has no compensable damages.

First, Saber Defendants contend that the September Agreement expressly exempted Protech from recoupment of "all" such costs and expenses relating to finding a replacement subcontractor. Specifically, paragraph 9 of the agreement provides that: "Each party will bear all expenses which it incurs in connection with the proposal, any negotiations which may follow, and all other efforts under this Agreement. Neither party will be liable for costs incurred by the other in connection with the proposal or any subsequent negotiations." See The September Agreement, ¶ 9. Saber Defendants rely on this language to show that Protech expressly agreed that it would not pursue the very claim it is now pursuing. The Court disagrees.

The express language of Paragraph 9 is clear - it encompasses the expenses incurred by both parties in connection with submitting the proposal to the State. Particularly, the language of the provision refers to the costs and expenses of the proposal and any negotiations which may follow in connection with the performance of the September Agreement. Indeed, after Covansys assisted Protech in obtaining the bid, there was no performance by either party; Protech did not hire Covansys/Saber for the Project. Thus, the damages Protech seeks do not relate to cost of performance; rather, Protech is seeking the costs relating to the alleged breach by Covansys. While the parties can limit certain categories of damages contractually, see, e.g., Armco Steel Crop. v. Ford Construction. Co., 237 Ark. 272 (1963), nothing in this provision can be construed to limit damages as a result of a breach.

Next, Saber Defendants argue that as a matter of law, such negotiations and related activities are not compensable in a breach of contract action, under the "tacit agreement" rule

followed by Arkansas courts.  See  Morran v. First Nat. Bank, 261 Ark. 568 (1977).  The tacit
agreement test was first established by the Arkansas Supreme Court in Hooks Smelting Co. v.
Planters' Compress Co., 72 Ark. 275, 279 (1904).  The Court explained that where there is no
express contract to pay special damages, "the facts and circumstances in proof must be such as to
make it reasonable for the judge or jury trying the case to believe that the party at the time of the
contract tacitly consented to be bound to more than ordinary damages in the case of default on
his part."  Id.; see also Shelton v. Albertson, No. CA 92-109, 1992 WL 79537 (Ark. App.
1992)("the appellant offered no proof that the appellee expressly or tacitly agreed to be liable for
damages to the inventory in the event of the appellee's failure to repair the roof").  Accordingly,
under the rule, in order to recover consequential damages in a breach of contract action, "the
plaintiff must prove more than the defendant's mere knowledge that a breach of contract will
entail special damages to the plaintiff. It must also appear that the defendant at least tacitly
agreed to assume responsibility." Reynolds Health Care Services, Inc. v. HMNH, Inc., 364 Ark.
168, 217 (2005).  As such, consequential damages are barred from recovery in a breach of
contract case absent evidence of an explicit or tacit agreement. Id.; see also Bank of America,
N.A. v. C.D. Smith Motor Co., 353 Ark. 228 (2003).

Relying on the tacit agreement rule, Saber Defendants posit that because the parties
expressly agreed that each would bear its own costs and expenses in connection with
"subsequent negotiations" and all other subsequent efforts under the September Agreement, the
rule precludes Protech from seeking the damages arising from employment related expenses.
Protech, on the other hand, contends that mitigation damages are direct damages flowing from

Covansys' alleged breach of the agreement.   For support, Protech relies on the doctrine of avoidable consequences.   Under this doctrine, "a party cannot recover damages resulting from consequences which he could have avoided by reasonable care, effort, or expenditure."   Quality Truck Equipment Co. v. Layman, 912 S.W.2d 18, 20 (Ark. App. 1995).   Therefore, "where a party is entitled to the benefit of a contract, and can save [itself] from loss arising from a breach thereof at a small expense or with reasonable exertions, it is [its] duty to do so, and [it] can only recover such damages as he could not thereby prevent."   Id. at 20-21 (quotations and internal alternation omitted).   Protech then cites to Third Circuit authorities and secondary sources for the proposition that a non-breaching party is entitled to recover all expenses reasonably incurred in the mitigating effort, even if it is not successful.   Prusky v. Reliastar Life Ins. Co., 532 F.3d 252, 258-63 (3d Cir. 2008); see 22 Am. Jur. 2d Damages § 417 (2008); 3 Dan D. Dobbs, Law of Remedies § 12.6(2) (2d ed. 1993); 11 Joseph M. Perillo, Corbin on Contracts § 57.16.   Having reviewed the cited authorities, the Court does not find Protech's position persuasive.

An independent search of Arkansas law does not reveal any case that directly addresses whether mitigation damages are direct or consequential.   However, the Third Circuit's holding in Prusky, which Protech cites, is persuasive on this subject.   While the appeals court discussed the application of Pennsylvania law, it found support for its ruling from other circuits and states. See Prusky, 532 F.3d 258-63.   After the circuit court determined that mitigation damages are recoverable in the event of a breach, the court went on to declare that "an injured party may recover for incidental and consequential costs/damages incurred as a result of its reasonable efforts at mitigation, even if the efforts proved unsuccessful."   Id. at 263 (citing Restatement

14

(Second) of Contracts § 350).  Simply put, the court found that damages flowing from the duty to mitigate are consequential in nature.  Indeed, despite Protech's efforts in differentiating between direct and consequential damages, Protech's own citations to secondary authorities show that mitigation damages are generally categorized as special damages.  See, e.g., Corbin on Contracts § 57.16.  Notably, Corbin on Contracts states that "Inasmuch as the law denies recovery for losses that can be avoided by reasonable effort and expense, justice requires that the risks incident to such effort should be carried by the party whose wrongful conduct makes them necessary.  Therefore, special losses that a party incurs in a reasonable effort to avoid losses resulting from a breach are recoverable as damages."  Corbin on Contracts § 57.16 (emphasis added).  Accordingly, contrary to Protech's argument, the Court finds that Protech's damages incurred from replacing Covansys for the Project are consequential damages.

Nevertheless, the inquiry does not end here.  The Court has already determined that there is no express language in the September Agreement wherein the parties agreed to pay special damages.  Next, the Court has to determine whether Covansys tacitly agreed to pay special or consequential damages in the event of a breach.  Indeed, pursuant to the tacit agreement rule, consequential damages are not recoverable unless Covansys tacitly agreed that it would be responsible to pay for mitigation damages.  While this generally is a factual question, Protech simply fails to point to any evidence to demonstrate that Covansys was made aware of special circumstances which may cause consequential damages to follow if it breached the agreement or that Covansys so agreed.  In its submission, since Protech insists that the mitigation damages it seeks are direct in nature, it necessarily ignores the tacit agreement rule.  It simply failed to

argue in the alternative that even if the damages are consequential, Covansys has tacitly agreed

to pay those damages.  In fact, nothing in the record supports that conclusion.  The record is

devoid of any facts or special circumstances that would reasonably suggest to the Court that

Covansys, at the time of the contract, tacitly consented to be bound to more than ordinary

damages in case of default.  See Reynolds, 364 Ark. at 176.  Accordingly, Saber Defendants'

motion is granted in this regard.  Finally, the Court notes that because Protech is not entitled to

the mitigation damages – the sole remedy it seeks in connection with its breach of contract claim

– its Counterclaims are dismissed in their entirety.[8]  As a final note, the Court need not address

Saber Defendants' last argument – that Protech profited by not hiring Covansys at the $64 rate

set forth in the September Agreement, and instead hired alternate subcontractors at an average

rate of $52 per hour – because Protech's Counterclaims are dismissed on other grounds.

**III.    Saber's Claims**

        **A.    Lost Profits**

Like the Saber Defendants, Protech relies on the tacit agreement rule in contending that

the Saber Defendants did not suffer any damages arising from Protech's alleged breach.  To

reiterate, Saber's breach of contract claim is premised on the allegation that Protech failed to hire

Covansys/Saber as a subcontractor on the Project in breach of the September Agreement.  As a

---

[8]Protech's bad faith claim is also dismissed because Protech cannot sustain its breach of
contract claim.  In fact, Arkansas courts have not recognized a cause of action for failure to act
in good faith under a contract.  See Preston v. Stoops, 373 Ark. 591, 594 (2008)("[t]he fact that
every contract imposes an obligation to act in good faith does not create a cause of action for a
violation of that obligation, and . . . this court has never recognized a cause of action for failure
to act in good faith" (quotations and citations omitted)).

result, Saber suffered lost profits as damages.  Moreover, in the alternative, Saber seek the costs of preparing the bid for the Project in its claims for unjust enrichment and Quantum Meruit.

First, Protech argues that the tacit agreement rule precludes Saber from seeking lost profits because, as enunciated above, consequential damages are not recoverable in Arkansas absent a tacit agreement at the time the September Agreement was signed that Protech would pay special damages.  Covansys retorts that recovery of its lost profits was within the contemplation of the parties.  Because this conflict involves an additional analysis of the tacit agreement rule, the Court will turn to a discussion of the law.

First, the Court has to distinguish between consequential and direct damages as the application of the tacit agreement rule hinges on this contrast.  Consequential damages are those damages that do not flow directly and immediately from the breach, but only from some of the consequences or results of the breach.  Armco Steel Corp. v. Ford Constr. Co., 237 Ark. 272, 276-77 (1963)("'[c]onsequential damages' is defined as such damage, loss, or injury as does not flow directly and immediately from the act of the party, but only from some of the consequences or results of such act" (quotations omitted)). Stated differently, special or consequential damages are those which are peculiar to a particular plaintiff and would not be expected to occur regularly as a result of a breach.  See Wartsila NSD N. Am., Inc. v. Hill Int'l Inc., 530 F.3d 269, 277-80 (3d Cir. 2008).  Given that definition, usually, lost profits in Arkansas are recognized as a type of consequential damages.  Reynolds, 364 Ark. at 175.

By contrast, general or direct damages "are those which the law presumes will flow from a particular wrong and which everyone would expect to result in the ordinary course of events."

IMI Norgren Inc. v. D & D Tooling & Mfg. Inc., 247 F. Supp. 2d 966, 970 (N.D. Ill. 2002)(direct damages include all such injurious consequences as proceed from, or have direct causal connection with the act); see also Roanoke Hosp. Ass'n v. Doyle & Russell, Inc., 215 Va. 796, 801 (1975)(direct damages are those which arise "naturally" or "ordinarily" from a breach of contract; they are those that can be expected to result from a breach).

While Arkansas courts in certain instances have determined that as a category, lost profits, are consequential damages, the circumstances of those cases are dissimilar to the present action.  In Morrow v. First National Bank of Hot Springs, 261 Ark. 568, 569 (1977), the court held that pursuant to the tacit agreement rule, defendant bank did not tacitly agree to pay special damages because it failed to inform the plaintiff regarding the availability of new safe deposit boxes, which the plaintiff claimed would have prevented his coin collection from being stolen. In so holding, the court found that the tacit agreement rule precluded the plaintiff from claiming the total amount of the lost coins.  It reasoned that "[t]he bank's bare promise to notify the plaintiffs as soon as the boxes were available did not amount to a tacit agreement that the bank, for no consideration in addition to its regular rental for the boxes, would be liable for as much as $ 32,000 if the promised notice was not given."  Id. at 572.

In Reynolds, the contract at issue was a management agreement between the corporate owner of a nursing home and a management company that operated the nursing home.  The owner claimed that the management company, by breaching the management agreement, caused it to incur various categories of damages, including lost revenue from termination of certain Medicare-Medicaid agreements and lost revenue arising from bad publicity after a Department

of Health report concerning the facility.  Reynolds, 364 Ark. at 169-171.  Having found that there was no express language that the management company would assume any liability for consequential damages, the court went on to hold that the management company did not tacitly agree to be liable for lost profits, particularly since it did not guarantee that the operation of the nursing home would be profitable.  Id. at 180; see also Shelton v. Albertson, No. 92-109, 1992 WL 79537 (Ark. App. 1992).

Relying on the cited cases discussed above, Protech argues that the lost profits being pursued by Saber are consequential damages for which Protech did not tacitly agree to be held liable.  Contrary to Protech's posture, unlike the circumstances in those cases, lost profits here are a form of direct damages.  Indeed, "lost profits are not always consequential damages; sometimes, they may be the natural, proximate result of a breach of contract." Deck House, Inc. v. Link, 98 Ark. App. 17, 26 (Ark. App. 2007); see Robertson v. Ceola, 255 Ark. 703, 704 (1973); Advance Constr. Co. v. Dunn, 263 Ark. 232, 234 (1978).  In this case, the Arkansas Supreme Court's decision in Dunn more appropriately addresses the parties' agreement and damages flowing therefrom.  In Dunn, the subcontractors sought to recover lost profit damages from the contractor, Advance, for its alleged breach of two contracts.  Advance terminated the subcontractors' contract on the basis that the asphalt surfacing in certain areas was unsatisfactory and the subcontractors had failed to complete their work after Advance had given them directions to do so according to specifications.  Dunn, 263 Ark at 233.  The Supreme Court held that when "a subcontractor, as here, is prevented by the general contractor from completing the work, 'the plaintiff may elect to rely upon the contract and claim the full amount of the agreed

19

price, less what it would have cost him to complete the construction.'" Id. at 235 (quoting Royal Manor Apts. v. Powell Const. Co., 258 Ark. 166 (1975)).

Dunn is analogous to the present case.  Here, Saber is seeking lost profit damages that flow directly from Protech's alleged breach of the September Agreement by failing to employ Covansys as the subcontractor.  While there remain issues of fact as to whether Covansys breached first, causing Protech to abandon its obligations under the agreement, and issues as to whether a profit would have been realized on this contract, nonetheless, the lost profits that Saber is seeking are a form of direct damages, not consequential in nature.  As such, the tacit agreement rule does not preclude Saber from claiming its loss.[9]

### B.    Unjust Enrichment and Quantum Meruit

Protech seeks summary dismissal of Saber's quantum meruit claim and unjust enrichment claim.  Essentially, under both theories of recovery, Saber seeks to recover the value of Covansys' assistance in helping Protech to secure its state bid.  Specifically, Saber alleges that Protech benefitted from a proposal created with the assistance of Covansys, and seeks direct damages for lost profits on its breach of contract claim for $1,080,000.  Further, Saber alleges that the proposal was provided to Protech with an expectation that Covansys/Saber would receive some form of compensation, assuming that Protech won the bid from New Jersey.  On the other hand, Protech argues, inter alia, that these claims should be barred because Saber has asserted claims for breach of the September Agreement and Paragraph 9 of the September

---

[9]Similarly, Saber's bad faith claim is dismissed because Arkansas does not recognize this type of cause of action.  See Preston, 373 Ark. at 594.

Agreement bars any claim by Saber for costs incurred. Also, Protech argues that the fact that Covansys withdrew from being the prime contractor for the Project did not restrict the ability of Protech to use the draft proposal in the event Covansys decided not to proceed.

Quantum meruit is aimed at preventing unjust enrichment through a quasi-contract. "Under Arkansas law, a claim for quantum meruit is generally made under the legal theory of unjust enrichment and does not involve the enforcement of a contract," and has allowed "a quantum meruit claim [to] succeed even when it is argued, in the alternative, to a contract that has been declared void." Sanders v. Bradley County Human Services Public Facility Board, 330 Ark. 675, 682 (1997). However, if an express agreement exists, either written or oral, "there can be no recovery for quantum meruit." Conrad v. Carter, 255 Ark. 327, 329 (1973) (quoting Christian and Taylor v. Francher, 151 Ark. 102 (1921) ("The terms of the express contract as alleged by appellee exclude the arising of any such implied contract as could form the basis of a claim upon a quantum meruit")); see also Highlines Construction Co., Inc., v. Caroll Electric Cooperative Corp., No. CA 07-715, 2008 Ark. App. LEXIS 126 (Ark. Ct. App. 2008)("It has been held that the quasi-contractual principle of unjust enrichment does not apply to an agreement deliberately entered into by the parties"); Lowell Perkins Agency, Inc. v. Jacobs, 250 Ark. 952, 959 (1971)("[T]he law never accommodates a party with an implied contract when he has made a specific one on the same subject matter").

Notwithstanding the foregoing, Saber argues that the Court should submit a breach of contract claim and an unjust enrichment claim to the jury, allow the jury to choose which of the two is proved, and direct recovery under one of those causes. Saber's argument is contrary to

established case law.  While a claim for unjust enrichment or quantum meruit can be pursued as an alternative theory of recovery when a dispute exists pertaining to the existence or enforceability of a contract, here, there is no dispute that a contract exists. see, e.g., Christian Taylor v. Fancher, 151 Ark. 102, 104 (1921)("Where there is an express contract for services . . . there can be no recovery quantum meruit"). Indeed, Saber did not even plead rescission in its Complaint.  See Ward v. Morrow, 15 F.2d. 660, 665 (8th Cir. 1926)("If plaintiff declares on an express contract, he cannot ordinarily, failing to prove it, recover on a quantum meruit. To entitle him to recover on a particular contract of employment he must plead it; and his proof must in all material respects conform to the allegations of the complaint; evidence at substantial variance therewith is inadmissible, and if admitted does not justify recovery").  Accordingly, Saber's unjust enrichment and quantum meruit claims are dismissed.

## CONCLUSION

For the foregoing reasons, Protech's motion is GRANTED in part and DENIED in part; Counts II, III and IV of Saber's Complaint are dismissed.  Saber Defendants' motion for summary judgment is GRANTED.


/s/   Freda L. Wolfson
The Honorable Freda L. Wolfson
United States District Judge


Dated:  September 25, 2009